# United States Court of Appeals
## *for the*
## Fifth Circuit

Case No. 25-50693

WENDY DAVIS; DAVID GINS; TIMOTHY HOLLOWAY,

*Plaintiffs-Appellees*,

UNITED STATES OF AMERICA,

*Intervenor-Appellee*,

v.

ELIAZAR CISNEROS,

*Defendant-Appellant*.

On Appeal from the United States District Court for the
Western District Of Texas (Pitman, J.)
No. 1:21-CV-00565-RP

## BRIEF OF PLAINTIFFS-APPELLEES WENDY DAVIS, DAVID GINS, AND TIMOTHY HOLLOWAY

COUNSEL LISTED ON INSIDE COVER

Samuel Hall
Robert Meyer
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 303-1000

Aaron E. Nathan
WILLKIE FARR & GALLAGHER LLP
787 Seventh Ave.
New York, NY 10019
Telephone: (212) 728-8904

JoAnna Barbara Suriani
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, # 163
Washington, D.C. 20006
Telephone: (202) 579-4582

Benjamin L. Berwick
PROTECT DEMOCRACY PROJECT
15 Main Street, Suite 312
Watertown, MA 02472
Telephone: (202) 579-4582

Sarah Xiyi Chen
Zachary Dolling
TEXAS CIVIL RIGHTS PROJECT
P.O. Box 17757
Austin, TX 78760
Telephone: (512) 474-5073

Nina Lea Oishi
TEXAS CIVIL RIGHTS PROJECT
P.O. Box 1108
Houston, TX 77251
Telephone: (512) 474-5073

*Counsel for Plaintiffs-Appellees Wendy Davis, David Gins, and Timothy Holloway*

# CERTIFICATE OF INTERESTED PERSONS

Case No. 25-50693

WENDY DAVIS; DAVID GINS; TIMOTHY HOLLOWAY,

*Plaintiffs-Appellees*,

UNITED STATES OF AMERICA,

*Intervenor-Appellee*,

v.

ELIAZAR CISNEROS,

*Defendant-Appellant*.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. Benjamin L. Berwick, *Counsel for Plaintiffs-Appellees*;

2. Binnall Law Group, *Counsel for Defendants Steve and Randi Ceh below*;

3. Francisco Raul Canseco, *Counsel for Defendant-Appellant*;

4. Randi Ceh, *Defendant below*;

5. Steve Ceh, *Defendant below*;

6. Chalmers, Adams, Backer & Wallen, LLC, *Counsel for Defendants Joeylynn and Robert Mesaros below*;

i

7.      Eliazar Cisneros, *Defendant-Appellant*;

8.      Sarah Xiyi Chen, *Counsel for Plaintiffs-Appellees*;

9.      Orion Danjuma, *Counsel for Plaintiffs-Appellees below*;

10.    Jared Fletcher Davidson, *Counsel for Plaintiffs-Appellees below*;

11.    Wendy Davis, *Plaintiff-Appellee*;

12.    Zachary Dolling, *Counsel for Plaintiffs-Appellees*;

13.    Martin K. Etwop, *Counsel for Defendants Steve and Randi Ceh below*;

14.    Travis Fife, *Counsel for Plaintiffs-Appellees below*;

15.    David Gins, *Plaintiff-Appellee*;

16.    Michael J. Gottlieb, *Counsel for Plaintiffs-Appellees below*;

17.    Jason C. Greaves, *Counsel for Defendants Steve and Randi Ceh below*;

18.    Samuel Hall, *Counsel for Plaintiffs-Appellees*;

19.    Rebecca Heath, *Counsel for Plaintiffs-Appellees below*;

20.    Timothy Holloway, *Plaintiff-Appellee*;

21.    Ashley Cheung Honold, *Counsel for Intervenor-Appellee*;

22.    Cerin Lindgrensavage, *Counsel for Plaintiffs-Appellees below*;

23.    Erin Elizabeth Mersino, *Counsel for Defendant Dolores Park below*;

24.    Joeylynn Mesaros, *Defendant below*;

25.    Robert Mesaros, *Defendant below*;

26.    Robert Meyer, *Counsel for Plaintiffs-Appellees*;

27. Noah Mussmon, *Counsel for Plaintiffs-Appellees below*;

28. Aaron E. Nathan, *Counsel for Plaintiffs-Appellees*;

29. Jerad W. Najvar, *Counsel for Defendants Joeylynn and Robert Mesaros below*;

30. Nina Oishi, *Counsel for Plaintiffs-Appellees*;

31. Amy Orlov, *Counsel for Plaintiffs-Appellees below*;

32. Dolores Park, *Defendant below*;

33. Protect Democracy Project, *Counsel for Plaintiffs-Appellees*;

34. Remnant Law, *Counsel for Defendants Steve and Randi Ceh below*;

35. JoAnna Barbara Suriani, *Counsel for Plaintiffs-Appellees*;

36. Texas Civil Rights Project, *Counsel for Plaintiffs-Appellees*;

37. Thomas More Law Center, *Counsel for Defendant Park below*;

38. Richard Thompson, *Counsel for Defendant Park below*;

39. Veronica Rhea Warms, *Counsel for Plaintiffs-Appellees below*;

40. Willkie Farr & Gallagher LLP, *Counsel for Plaintiffs-Appellees*;

41. Jamielah Yancey, *Counsel for Plaintiffs-Appellees below*.

This the 22nd day of April, 2026.

Respectfully submitted,

*/s/ Samuel Hall*
Samuel Hall
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.

Washington, D.C. 20006
Telephone: (202) 303-1000
shall@willkie.com

**STATEMENT REGARDING ORAL ARGUMENT**

The issues on appeal raised by Defendant-Appellant Cisneros merit oral argument. Plaintiffs-Appellees respectfully request oral argument in order to aid in a full and complete consideration of the issues.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ...................................................... i

STATEMENT REGARDING ORAL ARGUMENT .................................................v

TABLE OF AUTHORITIES ....................................................................... viii

STATEMENT OF JURISDICTION...................................................................1

ISSUES PRESENTED....................................................................................2

INTRODUCTION .........................................................................................3

STATEMENT OF THE CASE .........................................................................6

    I.      BACKGROUND.....................................................................6

    II.     PROCEDURAL HISTORY ....................................................10

    III.    STATUTORY BACKGROUND.............................................15

         A.     As codified, 42 U.S.C. § 1985 bans five distinct categories of conspiracy. ...............................................15

         B.     The drafting, passage, and codification of Section 2 of the 1871 Act. ...........................................................17

              1.     Congress intends the 1871 Act to protect broader civil rights. ..................................................17

              2.     Section 2 of the Act is amended to add a class-based animus requirement to some, but not all, of its clauses. ..................................................18

              3.     The Senate adds two new clauses, including the support-or-advocacy clauses...........................21

              4.     The Act passes, and enforcement begins.......................22

              5.     The Act is codified, and the criminal enforcement provisions of the support-or-advocacy clauses are repealed.................................................23

SUMMARY OF THE ARGUMENT ................................................................24

STANDARD OF REVIEW ........................................................................26

ARGUMENT ...........................................................................................27

    I.    The Act's support-or-advocacy clauses create an independent substantive right to engage in support or advocacy in federal elections, neither cabined to the right to vote nor requiring state action. .................................................................................28

        A.    This Court and Reconstruction-era courts have already rejected the argument that the support-or-advocacy clauses are limited to constitutional violations committed by state actors. .................................................30

        B.    The support-or-advocacy clauses' text and history confirm that they create an independent substantive right to engage in support or advocacy in federal elections. .............................33

        C.    Cisneros's contrary cases are either distinguishable or unpersuasive. ......................................................42

        D.    Because the support-or-advocacy clauses create a substantive right to engage in support-or-advocacy in federal elections, they neither require state action nor are limited to only private conspiracies connected to voting. ........48

    II.    The District Court correctly held that the support-or-advocacy clauses do not require a showing of class-based animus. ....................50

CONCLUSION ........................................................................................54

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Andrade v. Stewart*,
   No. CV 20-886-BAJ-SDJ, 2022 WL 1286230 (M.D. La. Jan. 5,
   2022), *report and recommendation adopted*, No. CV 20-00886-
   BAJ-SDJ, 2022 WL 731514 (M.D. La. Mar. 10, 2022) .....................................54

*Andrews v. D'Souza*,
   696 F. Supp. 3d 1332 (N.D. Ga. 2023) ...................................................31, 36, 53

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
   570 U.S. 1 (2013) ...................................................................................................45

*Barron v. City of Baltimore*,
   32 U.S. 243 (1833) .................................................................................................30

*Bray v. Alexandria Women's Health Clinic*,
   506 U.S. 263 (1993) .........................................................................................43, 50

*Brooks v. Nacrelli*,
   473 F.2d 955 (3d Cir. 1973) ..................................................................................46

*Bryan v. City of Madison*,
   213 F.3d 267 (5th Cir. 2000) .................................................................................54

*Bryant v. Military Department of Mississippi*,
   597 F.3d 678 (5th Cir. 2010) .................................................................................52

*Buckley v. Valeo*,
   424 U.S. 1 (1976) ...................................................................................................45

*Burroughs v. United States*,
   290 U.S. 534 (1934) ...............................................................................................46

*Castille v. Port Arthur ISD*,
   168 F.4th 240 (5th Cir. 2026) ................................................................................28

*Chan v. Korean Air Lines, Ltd.*,
   490 U.S. 122 (1989) ...............................................................................................38

*City of Boerne v. Flores*,
521 U.S. 507 (1997)............................................................................44

*Cook v. Randolph Cnty.*,
573 F.3d 1143 (11th Cir. 2009) ........................................................46

*Cunningham v. Panola Cnty.*,
No. 6:10-CV-362, 2011 WL 2149537 (E.D. Tex. May 8, 2011),
*report and recommendation adopted*, No. 6:10CV362, 2011 WL
2135439 (E.D. Tex. May 31, 2011)....................................................54

*Daigle v. Gulf State Utilities Co.*,
794 F.2d 974 (5th Cir. 1986) .............................................................52

*Deubert v. Gulf Fed. Sav. Bank*,
820 F.2d 754 (5th Cir. 1987) .............................................................54

*Federer v. Gephardt*,
363 F.3d 754 (8th Cir. 2004) .......................................................47, 48

*Gerber v. Herskovitz*,
14 F.4th 500 (6th Cir. 2021) ..............................................................46

*Gill v. Farm Bureau Life Insurance Co. of Missouri*,
906 F.2d 1265 (8th Cir. 1990) ...........................................................47

*Graham v. Clusen*,
427 F. Supp. 820 (D.D.C. 1977).........................................................46

*Graham v. Connor*,
490 U.S. 386 (1989)......................................................................35, 46

*Gray v. Darien*,
927 F.2d 69 (2d Cir. 1991), *cert. denied*, 502 U.S. 856 (1991) .........46

*Griffin v. Breckenridge*,
403 U.S. 88 (1971)..............................................................18, 20, 39

*Grimes v. Smith*,
776 F.2d 1359 (7th Cir. 1985) ...........................................................46

*Haddle v. Garrison*,
525 U.S. 121 (1998)............................................................................35

*Horaist v. Doctor's Hosp. of Opelousas*,
255 F.3d 261 (5th Cir. 2001) ..............................................54

*United States ex rel. Katzenbach v. Original Knights of Ku Klux Klan*,
250 F. Supp. 330 (E.D. La. 1965)..........................................45

*Kimble v. D. J. McDuffy, Inc.*,
648 F.2d 340 (5th Cir. 1981) (en banc) .............................50, 53

*Kinney v. Weaver*,
367 F.3d 337 (5th Cir. 2004) (en banc) .................4, 25, 34, 53

*Kush v. Rutledge*,
460 U.S. 719 (1983).................................................*passim*

*Landry's, Inc. v. Ins. Co. of the State of Pa.*,
4 F.4th 366 (5th Cir. 2021) ..............................................38

*League of United Latin Am. Citizens - Richmond Region Council 4614*
*v. Pub. Int. Legal Found.*,
No. 1:18-CV-00423, 2018 WL 3848404 (E.D. Va. Aug. 13, 2018)............31, 53

*Logan v. United States*,
144 U.S. 263 (1892), *abrogated on other grounds by Witherspoon*
*v. Illinois*, 391 U.S. 510 (1968) .......................................40

*Lugar v. Edmondson Oil Co.*,
457 U.S. 922 (1982).......................................................46

*Manhattan Cmty. Access Corp. v. Halleck*,
587 U.S. 802 (2019)......................................................31

*McConnell v. FEC*,
540 U.S. 93 (2003), *overruled on other grounds by Citizens United*
*v. FEC*, 558 U.S. 310 (2010) ...........................................45

*McCord v. Bailey*,
636 F.2d 606 (D.C. Cir. 1980), *cert. denied*, 451 U.S. 983 (1981)
.....................................................................18, 19, 41, 51

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) (Thomas, J., concurring) ...........................42

*McLellan v. Mississippi Power & Light Co.*,
545 F.2d 919 (5th Cir. 1977) (en banc) ...............................................53

*In re Mesaros*,
No. 23-50593 (5th Cir. Aug. 28, 2023) ......................................13, 27

*Montano v. Orange Cnty.*,
842 F.3d 865 (5th Cir. 2016) ..............................................................27

*Nat'l Coal. on Black Civic Participation v. Wohl*,
498 F. Supp. 3d 457 (S.D.N.Y. 2020) .........................................31, 53

*Newberry v. E. Texas State Univ.*,
161 F.3d 276 (5th Cir. 1998) ..............................................................54

*In re Park*,
No. 23-50585 (5th Cir. Sep. 13, 2023) ......................................13, 14

*Paynes v. Lee*,
377 F.2d 61 (5th Cir. 1967) .........................................5, 25, 30, 31

*Prescott v. Denton Cnty. Jail*,
No. 4:16-CV-879, 2025 WL 891871 (E.D. Tex. Feb. 25, 2025),
*report and recommendation adopted*, No. 4:16-CV-879, 2025 WL
885850 (E.D. Tex. Mar. 21, 2025) ......................................................54

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000)..............................................................................27

*Rock v. Arkansas*,
483 U.S. 44 (1987)................................................................................44

*Sirius Sols., L.L.L.P. v. Comm'r of Internal Revenue*,
165 F.4th 374 (5th Cir. 2026) ............................................................37

*Stromberg v. California*,
283 U.S. 359 (1931)..............................................................................40

*United Bhd. of Carpenters & Joiners of Am., Loc. 610, AFL-CIO v.
Scott*,
463 U.S. 825 (1983)..............................................................35, 42, 43

*United States v. Bowman*,
   636 F.2d 1003 (5th Cir. Unit A Feb. 1981) ........................................45

*United States v. Bryant*,
   996 F.3d 1243 (11th Cir. 2021), *superseded in part on other
   grounds by* U.S.S.G. § 1B1.13 (2023) ....................................40, 53

*United States v. Butler*,
   25 F. Cas. 213 (C.C.D.S.C. 1877) (No. 14,700)...............................33

*United States v. Crosby*,
   25 F. Cas. 701 (C.C.D.S.C. 1871) (No. 14,893)..........................23, 45

*United States v. Goldman*,
   25 F. Cas. 1350 (C.C.D. La. 1878) (No. 15, 225) ...................32, 33, 45

*Wigginton v. Jones*,
   964 F.3d 329 (5th Cir. 2020) .....................................................26, 27

**Statutes**

24 Rev. Stat. § 1980 ...................................................................23

42 U.S.C. § 1983 .......................................................................38

42 U.S.C. § 1985(1) ...................................................................16

42 U.S.C. § 1985(2) ...............................................................16, 17

42 U.S.C. § 1985(3) ............................................................*passim*

70 Rev. Stat. §§ 5336, 5406-5507, 5518-5520 ....................................23

Act of May 31, 1870, ch. 114, §§ 3-4, 16 Stat., *ruled unconstitutional
   as a vehicle to enforce 15th Amendment in United States v. Reese*,
   92 U.S. (2 Otto) 214 (1875).....................................................38

Act of Apr. 20, 1871, ch. 22, § 2, 17 Stat. 13 ..................................15

Act of Feb. 8, 1894, ch. 25, § 1, 28 Stat. 36 .....................................23

**Other Authorities**

CONG. GLOBE, 42d Cong., 1st Sess...........................................*passim*

Cong. Globe, 42d Cong., 1st Sess. App. ........................................................... 18, 20

Craig R. Senn, *Ending Political Discrimination in the Workplace*, 87
Mo. L. Rev. 365 (2022) ............................................................................. 47

Eugene Volokh, *Private Employees' Speech and Political Activity:
Statutory Protection Against Employer Retaliation*, 16 Tex. Rev.
L. & Pol. 295 (2012) ............................................................................... *passim*

Michael Weingartner, *Remedying Intimidating Voter Disinformation
Through § 1985(3)'s Support-or-Advocacy Clauses*, 110 Geo. L.J.
Online 83 (2021) ........................................................................................ 31

New Illustrated Edition of Dr. Webster's Unabridged Dictionary of
the English Language 24 (London: Bell and Daldy 1864) ........................ 36, 37

Note, *The Support or Advocacy Clause of § 1985(3)*, 133 Harv. L.
Rev. 1382 (2020) ........................................................................................ 31

## STATEMENT OF JURISDICTION

The District Court had subject-matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because it arises under 42 U.S.C. § 1985(3), a federal law.

This Court has appellate jurisdiction under 28 U.S.C. § 1291 over this appeal from a final judgment of a United States District Court, entered August 1, 2025. Cisneros's notice of appeal, ROA.27426, filed on August 21, 2025, was timely under Fed. R. App. P. 4(a)(1)(A).

**ISSUES PRESENTED**

I.     Whether the District Court correctly held that the support-or-advocacy clauses of 42 U.S.C. § 1985(3) create a substantive right to engage in support or advocacy in a federal election?

II.    Whether the District Court correctly held that Plaintiffs alleging violations of the support-or-advocacy clauses of 42 U.S.C. § 1985(3) need not allege class-based animus?

## INTRODUCTION

This appeal arises out of Defendant-Appellant Eliazar Cisneros's conspiracy to prevent Plaintiffs-Appellees Wendy Davis, Timothy Holloway, and David Gins (together, "Plaintiffs") from exercising their federal statutory right to support and advocate for their federal candidate of choice on October 30, 2020 (hereinafter "October 30"), in the waning days of a presidential election. That conspiracy, in fact, succeeded: Plaintiffs canceled their scheduled campaign stops after being chased, surrounded, and harassed by a caravan of cars and trucks that included Cisneros and dozens of other drivers. Cisneros bragged about his success and took full credit, boasting online that he was "[s]mart enough to get the entire Biden Harris campaign cancelled in Texas[.]" ROA.31344. And with respect to a collision between his car and a campaign vehicle within feet of Plaintiffs' campaign bus, Cisneros similarly bragged, "that was me slamming that f****er….Hell yea" and that he "welcomed him properly to Texas." ROA.28733:15-28734:22, 31343.

A jury ultimately found Cisneros liable for violating the support-or-advocacy clauses of 42 U.S.C. § 1985(3) (the "support-or-advocacy clauses") which create liability for those who "conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner" in favor of a presidential or congressional candidate for federal office.

The jury awarded Plaintiff Timothy Holloway $10,000 in damages and all Plaintiffs a collective $30,000 in punitive damages.

On appeal, Cisneros raises two arguments. First, he argues that the support-or-advocacy clauses are merely a remedial device for enforcing constitutional rights found elsewhere: (a) the right to vote, and (b) rights under the First Amendment, for which Plaintiffs must also show the element of state action. Second, he argues that a claim under the support-or-advocacy clauses requires a showing of class-based animus. But both arguments share a fatal flaw: they ask this Court to depart from the plain text of the statute and insert elements where none exist. As this Court has previously held en banc, such "non-textual limiting construction[s]" of Section 1985 are "erroneous[]." *Kinney v. Weaver*, 367 F.3d 337, 352 n.14 (5th Cir. 2004) (en banc).

The District Court correctly rejected Cisneros's first argument, holding that the support-or-advocacy clauses mean what they say: they create a substantive right to engage in support or advocacy in federal elections, beyond the act of voting and independent of any other constitutional right. This Court has already held that the support-or-advocacy clauses are "something more and something different" than merely a remedy for Fourteenth Amendment violations carried out under color of state law, and as a result, the support-or-advocacy clauses create a "remedy for

4

interference by private individuals," without the need for state action. *Paynes v. Lee*, 377 F.2d 61, 63-64 (5th Cir. 1967).

The cases Cisneros cites to the contrary are unavailing for two reasons: first, all but three of his cases interpret a different portion of Section 1985(3), not the support-or-advocacy clauses, with inapplicable reasoning. Second, the only cases that directly analyze the support-or-advocacy clauses are wrongly reasoned out-of-circuit cases that are directly at odds with this Court's precedent. Those cases offer no analysis to support Cisneros's position, and have faced substantial criticism for their atextual approach to interpreting the support-or-advocacy clauses.

The District Court also correctly rejected Cisneros's second argument, concluding that the support-or-advocacy clauses do not require a showing of class-based animus. *Kush v. Rutledge*, 460 U.S. 719 (1983), establishes a simple test for determining when a Section 1985 claim requires an allegation of class-based animus: does the provision contain the "critical language" requiring conspirators to be motivated by a desire to deny equal protection? The support-or-advocacy clauses do not, and thus do not require a showing of class-based animus. The few cases Cisneros cites in support of a contrary conclusion either do not interpret the support-or-advocacy clauses or did not survive *Kush*.

The District Court's denial of Cisneros's Rule 50 motion should be affirmed.

**STATEMENT OF THE CASE**

## I.    BACKGROUND

In 2020, Plaintiffs Wendy Davis, David Gins, and Timothy Holloway were, respectively, a surrogate, a staffer, and a contractor for the Biden-Harris campaign. *See* ROA.28477:12-14, 29040:14-18, 28925:4-6. Each intended to spend October 30, 2020 campaigning across central Texas in support of the Biden-Harris presidential ticket. *See* ROA.28476:19-28477:11, ROA.28937:2-6, ROA.29064:24-29065:2. Instead, Plaintiffs were chased, surrounded, and harassed by a caravan of cars and trucks that included Cisneros. Cisneros worked with the caravan to swarm the Biden-Harris campaign bus (the "Bus") as it drove from San Antonio, Texas, to Austin, Texas, *see* ROA.28693:22-28696:10, 29247:22-29249:10, 29250:17-18, preventing it from making campaign stops, ROA.29072:5-29073:10, and injuring Plaintiff Holloway in the process, ROA.26944.

Cisneros played a critical role in the conspiracy to prevent Plaintiffs from campaigning. Cisneros boasted about his plan's success, stating that he was "[s]mart enough to get the entire Biden Harris campaign cancelled in Texas[.]" ROA.31344. And Cisneros spearheaded the conspiracy from the beginning: he and non-party Jason Peña-Ahuyon first learned of the Bus's planned tour and campaign stops in Texas at least a few days before October 30. ROA.31342. They then created a plan to "welcome [the Bus] to Texas so to speak" by "getting a convoy and welcoming

them that way." *Id.* To recruit participants, Cisneros and Peña-Ahuyon spread the word about the convoy, with Peña-Ahuyon describing it as "Operation Block the Bus" on Facebook. ROA.29200:7-10, 31342, 31345.

As part of their plan, Cisneros and Peña-Ahuyon agreed that Cisneros would be responsible for recruiting participants from San Antonio, Texas and that Peña-Ahuyon would be responsible for recruiting participants from New Braunfels, Texas and San Marcos, Texas. ROA.31342. Cisneros's recruitment efforts included communicating with Edward Niño, the organizer of the "Alamo City Trump Train" group. ROA.29186:22-29187:2, 30223:8-17. Cisneros also communicated with many other "eager" people in the days leading up to October 30. ROA.29196:13-25, 31342.

Plaintiffs never received these text messages in discovery because Cisneros intentionally destroyed them. ROA.26919-20. After an evidentiary hearing on Cisneros's spoliation, the District Court ordered a jury instruction stating that Cisneros "intentionally deleted text messages, relevant to Plaintiffs' claims in this litigation, with Jason Peña, Edward Niño, and others from the days leading up to October 30, 2020, and on October 30, 2020," and that "[the jury] may presume that Eliazar Cisneros deleted those text messages because they were unfavorable to his case and would have been used by Plaintiffs to establish his liability." ROA.26920. Peña-Ahuyon also refused to provide any additional details regarding their plan,

invoking the Fifth Amendment in response to questions regarding his communications with Cisneros, including whether he discussed with Cisneros how to stop the Bus from campaigning, ROA.30011:6-9, whether he agreed with Cisneros that the purpose of the "Trump train" was to stop the Bus from campaigning as intended, ROA.30011:18-21, and whether Cisneros shared the goal of preventing the Bus from campaigning in their community, ROA.30014:12-23.

On October 30, Cisneros first served as the lookout for the Bus for several hours on the side of Interstate 35, communicating via text message with Peña-Ahuyon and Niño. ROA.29234:8-29235:3, 31342. Niño eventually located the Bus at the AT&T Center in San Antonio and relayed that information to Cisneros, ROA.30222:24-30223:7, who then drove to the AT&T Center, positioned his vehicle to have a clear view of the Bus, and started a Facebook livestream to tell people waiting in New Braunfels to get ready because the Bus was coming, *see* ROA.29241:25-29242:8, 29244:24-29245:11, 29247:6-9. Cisneros then waited for the Bus to leave and joined the convoy of twenty to thirty cars that began to surround it en route to its next campaign stop. ROA.29247:19-29248:11. Approximately seventy-five additional cars joined Cisneros in the convoy in New Braunfels. ROA.29248:18-29249:10.

During the incident, Cisneros drove in a "very dangerous" manner and helped the other drivers to surround and slow the Bus to a crawl. ROA.28685:1-28687:19,

28738:3-28739:7, 28752:4-28753:15. There were constantly vehicles in front of the Bus, and there were numerous examples of vehicles brake-checking the Bus. ROA.28693:22-28694:22, 28726:11-15. Dr. Theron Bowman, a longtime police chief and expert in traffic and highway safety, testified that the vehicles' positioning in front of the Bus created a dangerous situation that could have caused—and very nearly did on multiple occasions—catastrophic consequences. ROA.28683:8-28684:16. The several-ton Bus was surrounded and forced to drive defensively, switching lanes several times and straddling two lanes to ensure sufficient space to maneuver. ROA.28686:22-28689:3.

The evidence showed that at one point on the highway, Cisneros sped up to get close to the back of the Bus and caused a collision with a campaign staffer's vehicle. ROA.28733:15-28734:22. Cisneros later described the collision as "slamming that f****er" and "welcom[ing] him properly to Texas." ROA.31343. He also posted online that "Texas welcomes Biden/Harris. We serve Brisket, Sausage, Leg quarters, Whataburger and 35 in[ch] tires . . . What would you like?" *Id.* Dr. Bowman testified that Cisneros caused the collision and that his actions risked spinning the staffer's car out of control on the highway. ROA.28738:3-28739:1.

Cisneros's conspiracy injured Plaintiffs. For example, Plaintiff Holloway, the driver of the Bus, testified about the anxiety he felt as he was on the road,

"surrounded with cars, not knowing what they [are] there for," and the fear that "if . . . they're bold enough to do this in [] broad daylight, what else would they do?" ROA.28948:16-28949:10. He testified about how he had to stay calm for his passengers, because as "captain of the ship" their safety was his responsibility, even though on the inside he felt "under attack." ROA.28949:11-28950:18. For approximately three to four months, he experienced several physical symptoms as a result of the incident, including nausea, loss of appetite, sweaty palms, and headaches. ROA.28965:19-28966:6. Thinking about the incident also caused him sleepless nights. ROA.28964:12-21. As a result of his experience, Plaintiff Holloway turned down professional opportunities driving entertainment buses—which were especially dear in the midst of the pandemic. ROA.28968:4-12. Instead, he dedicated himself to his trucking business, which was more work and less pay, but allowed him anonymity and helped him to avoid thinking about October 30. *See* ROA.28966:22-28968:3. Plaintiff Holloway testified that he would never again drive an identifiable campaign bus. ROA.28969:15-25.

## II. PROCEDURAL HISTORY

Plaintiffs filed their complaint in June 2021, ROA.112-173, asserting that Cisneros and the other Defendants[1] violated the support-or-advocacy clauses of

---

[1] Plaintiffs initially brought claims against Cisneros and four other named defendants, including, as relevant to this procedural history, Joeylynn and Robert Mesaros (the "Mesaroses"), and Dolores Park.

Section 1985(3).[2] Defendants filed motions to dismiss Plaintiffs' original complaint, ROA.284-301, 324-345, with Cisneros moving to dismiss Plaintiffs' complaint under Fed. R. Civ. P. 12(b)(1), arguing, *inter alia*, that 42 U.S.C. § 1985(3) "contemplates racial motives." ROA.299. Cisneros also moved to dismiss Plaintiffs' complaint under Fed. R. Civ. P. 12(b)(6). *Id.*

The District Court denied the motions to dismiss. ROA.854-867. To start, the District Court held that the support-or-advocacy clauses are distinct from "the first portion of Section 1985(3)," which relates to depriving individuals of the "equal protection of the laws" or "equal privileges and immunities under the laws." ROA.861-864. In turn, the District Court found that the support-or-advocacy clauses do not require a finding of racial or other class-based animus. *Id.* Citing to this Court's precedent, the District Court also found that the support-or-advocacy clauses were created "to allow plaintiffs to recover damages for interference with their election-related rights and [are] a 'specific remedy for interference by private individuals[,]'" not simply the acts of state. ROA.865-866 (quoting *Paynes*, 377 F.2d at 63-64).

Shortly after, Defendants filed their first motions for a certificate of appealability pursuant to 28 U.S.C. § 1292 and reconsideration of the District

---

[2] Plaintiffs also brought two claims under Texas state law, which are not at issue in this appeal. ROA.1864-1866.

Court's Order denying the motions to dismiss. ROA.886-903, 914-924.[3] In their motions, Defendants requested that the District Court certify an interlocutory appeal. *Id.* The District Court denied these motions, declining to reconsider its previous decision on the motions to dismiss and finding that the requirements for interlocutory appeal under 28 U.S.C. § 1292 were not met. ROA.1359-1365.

Plaintiffs then amended their complaint,[4] ROA.1805-1865, and several Defendants responded by filing renewed motions to dismiss and requests to authorize an interlocutory appeal, ROA.2087-2110. The Mesaroses, Park, and Cisneros (by incorporation), argued again that the District Court should dismiss Plaintiffs' claims under the support-or-advocacy clauses and, in the alternative, urged the District Court to certify an interlocutory appeal to resolve the question of whether Plaintiffs were required to plead the elements of racial animus or state action for their support-or-advocacy clauses claims. *Id.*

The District Court denied both the renewed motions to dismiss and motions for interlocutory appeal. ROA.2711-2719. Because Defendants' motions simply rehashed their prior arguments, the District Court adhered to its previous application of the support-or-advocacy clauses. ROA.2715-2716. The District Court also denied

---

[3] This brief refers to "Defendants" in the procedural history section beyond Cisneros because Cisneros often incorporated the arguments of his co-Defendants. *See, e.g.*, ROA.924.

[4] Plaintiffs' amended complaint added three new defendants, none of whom are relevant to this appeal.

the renewed requests to certify an interlocutory appeal for the reasons stated in its prior order. ROA.2718.

The Mesaroses and Park then filed petitions for writs of mandamus with the Fifth Circuit. ROA.2722-2776, 3394-3441. They asked the Fifth Circuit to vacate the District Court's denial of Defendants' motions to dismiss, or in the alternative, direct the District Court to certify an appeal under 28 U.S.C. § 1292(b). *Id.* The Fifth Circuit issued an unpublished order, denying the Mesaroses' petition for writ of mandamus but recognizing multiple "substantial ground[s] for difference of opinion" that could justify an interlocutory appeal under 28 U.S.C. § 1292(b). *In re Mesaros*, No. 23-50593 (5th Cir. Aug. 28, 2023). The Fifth Circuit also denied Park's petition for mandamus relief. *In re Park*, No. 23-50585 (5th Cir. Sep. 13, 2023).

Shortly after, the Mesaroses, Park, and Cisneros requested again that the District Court reconsider its earlier denial of certification of an interlocutory appeal. ROA.3914-3919, 3975-3990. The District Court denied the motions for reconsideration and the renewed requests to certify an interlocutory appeal. ROA.10609-10623. It issued a detailed opinion concluding that certification still was not warranted because it would not materially advance the ultimate termination of the litigation. ROA.10616-10622.

Park then filed a motion with the Fifth Circuit to renew her request for mandamus. ROA.10626-10639. The Fifth Circuit again denied mandamus relief. *In re Park*, No. 23-50585 (5th Cir. Jan. 9, 2024).

Cisneros, Park, and the Mesaroses filed motions for summary judgment, ROA.15901-15944, and Plaintiffs filed a consolidated response. ROA.16584-16641. The District Court denied those Defendants' motions in a lengthy sixty-four-page opinion, again explaining why Plaintiffs' claims were legally proper as a matter of text, history, and precedent. ROA.25472-25535.

A jury trial was held in this matter in September 2024. The jury returned a verdict finding Cisneros liable for engaging in a conspiracy in violation of 42 U.S.C. § 1985(3). ROA.26941. After the jury verdict, counsel for Cisneros orally moved for judgment notwithstanding the verdict. ROA.26949. The District Court took the motion under advisement and later ordered Cisneros to file a written brief in support of his motion on or before October 6, 2024. *Id.* Cisneros filed his Motion for Judgment on Partial Jury Findings or for a New Trial on September 30, 2024. ROA.26951-26962. He then belatedly filed a Supplement to his Motion on October 7, 2024. ROA.26970-26973. Plaintiffs filed a response in opposition, ROA.26981-27002, and Cisneros did not file a reply. The District Court denied Cisneros's motion and struck his late supplement. ROA.27322-27341.

The District Court entered final judgment on August 1, 2025. ROA.27341-27343. Cisneros filed a timely notice of appeal on August 21, 2025. ROA.27426.

## III. STATUTORY BACKGROUND

This appeal concerns the interpretation of the support-or-advocacy clauses found in 42 U.S.C. § 1985. *See* Act of Apr. 20, 1871, ch. 22, § 2, 17 Stat. 13, 14. This section surveys the statutory background of Section 1985 to aid this Court's assessment of Cisneros's proposed interpretation of its elements.

### A. As codified, 42 U.S.C. § 1985 bans five distinct categories of conspiracy.

As currently codified, 42 U.S.C. § 1985(3) reads, in part:

*If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws*; **or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy[.]**

42 U.S.C. § 1985(3) (emphasis added).

The support-or-advocacy clauses, found in the bolded statutory language above, are but one portion of what is now 42 U.S.C. § 1985. All of the statutory provisions now found in that section, including the support-or-advocacy clauses,

were enacted as part of Section 2 of the Enforcement Act of 1871 (the "1871 Act," or the "Act," and sometimes known as the "Ku Klux Klan Act"). As the Supreme Court has recognized, the "length and style of § 2 of the 1871 Act"—namely, one long multipage run-on sentence containing a variety of prohibitions that have different texts, legislative histories, and constitutional bases—"make it somewhat difficult to parse." *Kush*, 460 U.S. at 724, 727-29. As a result, the first step when interpreting the Act must be to "carefully identif[y]" Section 2's "several components" and determine which one it is interpreting. *Id.* Only then can the provision's "meaning become[] clear." *Id.*

As currently codified, Section 1985 bans five textually distinct categories of conspiracies:

- Section 1985(1)'s **federal officers clauses** make it unlawful to engage in conspiracies that interfere with the performance of official duties by federal officeholders. 42 U.S.C. § 1985(1).

- Section 1985(2)'s **administration of federal justice clauses** protect parties, witnesses, and jurors in federal courts from conspiracies that interfere with the administration of justice. 42 U.S.C. § 1985(2).

- Section 1985(2)'s **administration of state justice clauses** make it unlawful to engage in conspiracies that obstruct justice in state courts so long as the

16

conspiracy is undertaken with the intent to deny persons the equal protection of the laws. 42 U.S.C. § 1985(2).

- Section 1985(3)'s **equal protection clauses**, italicized in the excerpted statute above, make it unlawful to engage in conspiracies for the purpose of depriving persons the equal protection of the laws or equal privileges and immunities. 42 U.S.C. § 1985(3).

- Section 1985(3)'s **support-or-advocacy clauses**—on which Plaintiffs based their claim and bolded above—make it unlawful to conspire to intimidate or injure lawful voters for providing support or advocacy for candidates in federal elections. 42 U.S.C. § 1985(3).

## B. The drafting, passage, and codification of Section 2 of the 1871 Act.

Though all of the statutory provisions now found in 42 U.S.C. § 1985 were passed as part of the same Act, the clauses were added at different times and have distinct statutory histories that directly inform their interpretation.

### 1. Congress intends the 1871 Act to protect broader civil rights.

The 1871 Act was Congress's third attempt in three years to bring order during Reconstruction. Prior legislative efforts, namely the Enforcement Acts of 1870 and 1871, had failed. The resulting anarchy imperiled not just civil rights, but also the "operation of government, especially the federal government" as well as "[c]ivil

survival." *McCord v. Bailey*, 636 F.2d 606, 615 (D.C. Cir. 1980), *cert. denied*, 451 U.S. 983 (1981).

Accordingly, Congress "intended" the 1871 Act "to reach more than attacks on government operations to further racial or other invidious discrimination, at least to the extent the Constitution permitted Congress to act." *Id.*; *see also Kush*, 460 U.S. at 727 n.10 (noting that *McCord* "accurately and persuasively" discussed the legislative history of the 1871 Act). Although the Reconstruction Congress intended to protect civil rights with the Act, its "concerns encompassed more than racial equality or personal rights." *McCord*, 636 F.2d at 615.

### 2. Section 2 of the Act is amended to add a class-based animus requirement to some, but not all, of its clauses.

As originally proposed, what would become Section 2 of the Act "was solely a criminal provision outlawing certain conspiratorial acts done with intent 'to do any act in violation of the rights, privileges, or immunities of another person.'" *Griffin v. Breckenridge*, 403 U.S. 88, 99-100 (1971) (citing CONG. GLOBE, 42d Cong., 1st Sess., App. 68). Many in Congress had constitutional concerns about the original language of Section 2, which would have given federal courts "jurisdiction of every criminal offense that could be committed anywhere within the limits of the United

States" and "practically abolished" state "criminal jurisdiction." *McCord*, 636 F.2d at 616-17.

To remedy these concerns, the House authors proposed an amendment that created both a civil cause of action and a criminal prohibition. *See* CONG. GLOBE, 42d Cong., 1st Sess. 477-78 (statement of House sponsor Rep. Shellabarger). The new, limiting amendment to Section 2 eliminated the prior wholesale criminal prohibition on any conspiratorial acts done with an intent to violate the rights, privileges, or immunities of another person. Instead, the new proposed statutory text set forth a detailed laundry list of unlawful conspiracies, including what would become the Act's federal officers clauses, administration of federal justice clauses, and equal protection clauses. When proposing the limiting amendment, its author explained that the laundry-list strategy allowed the drafters to break out the provisions of the Act that were "clearly independent of the fourteenth amendment, referable to and sustainable by the old provisions of the Constitution" (such as conspiracies to intimidate federal officers, which would become the Act's **federal officers clauses**), and those that *were* derived from the Fourteenth Amendment (such as conspiracies to deny any person or class or persons the equal protection of the laws, which would become the Act's **equal protection clauses**). *Id.* at 478.

The drafters of the limiting amendment also sought to quell concerns that the proposed equal protection clauses exceeded Congress's Fourteenth Amendment

enforcement powers by adding a class-based "animus" requirement to that provision. *Id.* at 477-78. The author of the limiting amendment explained that the earlier version of Section 2 was based on the flawed assumption that Congress's Fourteenth Amendment's enforcement power allowed Congress to "directly punish" offenses such as robbery, mayhem, and murder because those crimes are supposedly "against the rights, privileges, and immunities of a person under the Constitution and laws of the United States." CONG. GLOBE, 42d Cong., 1st Sess. App. 188. By contrast, the new, narrower version of Section 2 required an "intent to deprive a person of the equal protection of the laws and of equal privileges and immunities under the laws." *Griffin*, 403 U.S. at 100 (quoting Rep. Willard, draftsman of the limiting amendment). Thus, the new statutory language stayed within "the extent to which we could go" under the Fourteenth Amendment because the Fourteenth Amendment "secured, and was only intended to secure, equality of rights and immunities, and that we could only punish by United States laws a denial of that equality." CONG. GLOBE, 42d Cong., 1st Sess., App. 188; *see also Griffin*, 403 U.S. at 100 (quoting same). As discussed *infra* at 44-45, however, the same concerns did not apply to the other conspiracies prohibited by Section 2, which derived from other authorities in the Constitution than the Fourteenth Amendment (namely, Congress's Article I authorities). After debate, the House accepted the revised approach to Section 2. *See* CONG. GLOBE, 42d Cong., 1st Sess. 522.

### 3. The Senate adds two new clauses, including the support-or-advocacy clauses.

Neither the Act's support-or-advocacy clauses nor its administration of state justice clauses were included in the House's revised Section 2. Instead, both provisions were first introduced in the Senate *one week after* the House adopted the limiting amendment.

The administration of state justice clauses were introduced first. *See* CONG. GLOBE, 42d Cong., 1st Sess. 702. Much like the House's proposed equal protection clauses, the administration of state justice clauses regulated an "underlying activity"—namely the obstruction of justice in state courts "that is not institutionally linked to federal interests" and "usually of primary state concern." *Kush*, 460 U.S. at 725. The proposed administration-of-justice clauses thus included similar limiting class-based animus language, "requiring that the conspirators' actions be motivated by an intent to deprive their victims of the equal protection of the laws." *Id*.; *see also* CONG. GLOBE, 42d Cong., 1st Sess. 702 (reporting amendment).

Later in that *same* Senate debate, a senator offered an amendment containing the support-or-advocacy clauses, which are at issue here. *Id.* at 704. That senator explained the amendment came from "a consultation among gentlemen on" the Senate Judiciary Committee, and he "presume[d] there would be no objection" to the amendment. *Id.* Unlike the administration of state justice clauses, the proposed

support-or-advocacy clauses omitted a class-based animus requirement and prohibited conspiring to

> by force, intimidation, or threats to prevent any citizen of the United States lawfully entitled to vote from giving his support or advocacy, in a lawful manner, toward or in favor of the election of any lawfully qualified person as an elector of President or Vice President of the United States, or as a member of the Congress of the United States, or to injure any such citizen in his person or property on account of such support or advocacy.

*Id.*

The amendment was agreed to in the Senate. *Id.* The House concurred in the Senate amendments containing both the administration of state justice clauses (with the "equal protection" limitation) and the support-or-advocacy clauses (without the "equal protection" limitation) the next day. *See* CONG. GLOBE, 42d Cong., 1st Sess. 724.

### 4. The Act passes, and enforcement begins.

Shortly thereafter, the Enforcement Act of 1871 passed both houses of Congress on April 20, 1871, and was signed into law. *Id.* at 832, 838.

Enforcement began immediately. And by November 1871, the Circuit Court for the District of South Carolina had already denied a motion to quash a criminal charge brought under the support-or-advocacy clauses, noting that "[w]e have no doubt of the power of [C]ongress to interfere in the protection of voters at federal elections, and that that power existed before the adoption of" the Reconstruction

22

Amendments. *United States v. Crosby*, 25 F. Cas. 701, 704 (C.C.D.S.C. 1871) (No. 14,893).

> **5.** **The Act is codified, and the criminal enforcement provisions of the support-or-advocacy clauses are repealed.**

Two final pieces of statutory history are important to consider when interpreting the Act.

*Codification*: In 1874, three years after the Act was passed, Congress approved a general recodification of federal statutes. In that recodification, the provisions of Section 2 were distributed throughout the first version of the Revised Statutes. The criminal prohibitions of Section 2 were codified separately from each other in, among other places, Title 70 of the Revised Statutes (the support-or-advocacy clauses' criminal enforcement provision is Section 5520). *See* 70 Rev. Stat. §§ 5336, 5406-5507, 5518-5520. Meanwhile, the codifiers put many of the civil causes of action for violations of Section 2 in a single section (Section 1980). *See* 24 Rev. Stat. § 1980. The Supreme Court has since instructed that the codification process was "not intended to change the substantive meaning of" Section 2. *Kush*, 460 U.S. at 724.

*Repeal*: In 1894, Congress repealed the criminal enforcement provisions of the support-or-advocacy clauses. *See* Act of Feb. 8, 1894, ch. 25, § 1, 28 Stat. 36, 37 (repealing Section 5520 of the Revised Statutes). However, the support-or-advocacy

clauses' civil enforcement provision, then found in Section 1980 of the Revised Statutes and now found at 42 U.S.C. § 1985, remains good law to this day.

## SUMMARY OF THE ARGUMENT

This is a statutory interpretation case about the proper interpretation of the 1871 Act's support-or-advocacy clauses. In relevant part, those clauses prohibit conspiring to intimidate or injure a lawful voter for "giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person" in a federal election. 42 U.S.C. § 1985(3).

On appeal, Appellant Cisneros raises two challenges to the District Court's interpretation of the support-or-advocacy clauses. First, he argues that the District Court erred in concluding that the support-or-advocacy clauses create an independent substantive right to engage in support or advocacy of federal candidates. Instead, Cisneros suggests that the clauses are merely remedial, designed only to protect already established First Amendment rights and voting rights, and therefore Plaintiffs' lawsuit necessarily fails because it does not allege state action consistent with the First Amendment or interference with voting rights. App. Br. 13-17. Second, Cisneros argues that support-or-advocacy claims require an allegation of class-based animus. App. Br. 17-20.

This Court should reject Cisneros's arguments and affirm the District Court.

(I).     When Congress used the words "support or advocacy," it accorded the terms their ordinary meaning (which would include political speeches by surrogates and supporters advocating for a federal candidate's election). It did not give the terms a specialized meaning of "the constitutional right to vote" and "the constitutional right to engage in First Amendment protected activities."

That is so for three reasons. *First*, this Court's decision in *Paynes v. Lee* rejects the argument that the support-or-advocacy clauses were limited to remedying Fourteenth and Fifteenth Amendment violations. 377 F.2d at 63-64. And Reconstruction-era support-or-advocacy cases make no mention of Cisneros's distinction between voting support-or-advocacy claims and First Amendment support-or-advocacy claims.

*Second*, "non-textual limiting construction[s]" of Section 1985 are "erroneous[]," *Kinney*, 367 F.3d at 352 n.14, and the plain text of the Act makes no mention of the terms and elements that Cisneros now attempts to wedge into the support-or-advocacy clauses—an absence that is all the more glaring because references to the right to vote and other constitutional protections abound in other Reconstruction-era statutes.

*Third*, Cisneros's cited cases are either (i) distinguishable because they interpret other provisions of Section 1985 (like Section 1985(3)'s equal protection clauses) that have materially distinct texts and constitutional groundings or (ii)

unpersuasive because they do not engage in textual analysis or sufficiently explain why cases interpreting Section 1985(3)'s equal protection clauses apply to the text of the support-or-advocacy clauses.

As a result, this Court should accord the support-or-advocacy clauses a substantive interpretation and reject Cisneros's contentions that plaintiffs must prove (i) a violation of the First Amendment's free speech protections (which require state action) or (ii) a violation of the right to vote. Those limitations are simply not implicated here.

(II). The support-or-advocacy clauses also do not have a class-based animus requirement. The class-based animus requirement for some—but not all— Section 1985 claims comes from the "critical language" in certain provisions of Section 1985 requiring that "conspirators act with intent to deprive their victims of the equal protection of the laws." *Kush*, 460 U.S. at 720, 724-25. But the text of the *support-or-advocacy clauses* "contain[s] no [such] language." *Id.* Accordingly, the support-or-advocacy clauses do not have a class-based animus requirement.

## STANDARD OF REVIEW

This Court reviews the "district court's denial of a motion for judgment as a matter of law *de novo*, applying the same standard applied by the district court." *Wigginton v. Jones*, 964 F.3d 329, 334 (5th Cir. 2020) (citation modified). "[T]he standard for granting summary judgment mirrors the standard for judgment as a

matter of law, such that the inquiry under each is the same." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citation modified). That means questions of law are reviewed de novo, *Wigginton*, 964 F.3d at 335, and "the evidence must be viewed in the light most favorable to the nonmovant," *Montano v. Orange Cnty.*, 842 F.3d 865, 873 (5th Cir. 2016).

## ARGUMENT

Cisneros makes only two arguments in his opening brief: (I) that the support-or-advocacy clauses are remedial and thus necessarily incorporate the limitations on the underlying constitutional rights (state action and/or interference with voting), App. Br. 13-17, and (II) that the support-or-advocacy clauses require an allegation of class-based animus, App. Br. 17-20. In a sixty-four-page summary judgment opinion, the District Court comprehensively addressed these arguments and found that Cisneros's suggested interpretations were wrong. That summary judgment order also had the benefit of guidance from a motions panel of this Court, which denied emergency mandamus writs but nonetheless recognized "substantial ground[s] for difference of opinion"—including some that Cisneros raises here—that could justify an interlocutory appeal. *In re Mesaros*, No. 23-50593 (5th Cir. Aug. 28, 2023).

Following the motions panel's direction to closely parse these issues, the District Court's summary judgment order laid out comprehensively why the same arguments Cisneros raises here are wrong, holding that the support-or-advocacy

clauses create an independent substantive right, ROA.25484-25495, and that the clauses have no class-based animus requirement, ROA.25497-25501. On appeal, Cisneros barely acknowledges—let alone rebuts—this extended reasoning, even though the District Court's denial of Cisneros's Rule 50 motion rests in relevant part on the reasoning in the summary judgment order. ROA.27326.

On both issues presented for review to this Court, the District Court's lengthy analysis was right: Cisneros's suggested interpretation is incompatible with Supreme Court and Fifth Circuit case law, the plain text of the statute, its statutory construction, and its legislative history. Any other arguments are waived. *See Castille v. Port Arthur ISD*, 168 F.4th 240, 257 (5th Cir. 2026) (arguments not raised or adequately briefed in opening brief are waived). That includes any contention that the support-or-advocacy clauses violate the First Amendment, an issue Cisneros glancingly alludes to in his Statement Regarding Oral Argument but waives by failing to argue it, *id*., and one which the District Court addressed fully in its summary judgment opinion, ROA.25510-25518.

The District Court should be affirmed.

I. **The Act's support-or-advocacy clauses create an independent substantive right to engage in support or advocacy in federal elections, neither cabined to the right to vote nor requiring state action.**

Cisneros first contends that when Congress made it unlawful to injure or intimidate voters for engaging in "support or advocacy," Congress actually intended

only to protect the right to vote (which does not extend beyond a narrow definition of voting) and to prohibit violations of the First Amendment (which requires a showing of state action). App. Br. 13-17.

But Cisneros's reading clashes with the support-or-advocacy clauses' plain text and precedent from both the Supreme Court and this Court. Instead, the proper view follows directly from the text: the support-or-advocacy clauses create "a free-standing federal statutory protection against conspiracies—whether private or governmental—aimed at retaliating against a person for a certain kind of conduct," namely giving "support or advocacy in a legal manner in favor of the election of a federal candidate." Eugene Volokh, *Private Employees' Speech and Political Activity: Statutory Protection Against Employer Retaliation*, 16 Tex. Rev. L. & Pol. 295, 324 (2012) (citation modified).

Accordingly, this Court should affirm the District Court and reject Cisneros's attempt to recast the support-or-advocacy clauses as a remedial procedural device for enforcing constitutional rights found elsewhere. As demonstrated below, Cisneros's approach is (A) untethered from this Court's prior opinion interpreting the support-or-advocacy clauses as well as Reconstruction-era support-or-advocacy cases, and (B) inconsistent with the support-or-advocacy clauses' plain text. Further, (C) Cisneros's cases to the contrary are either inapposite or wrongly reasoned. And when the support-or-advocacy clauses are properly understood to be substantive, (D)

Cisneros has no basis for his argument that the clauses require either a violation of (i) the First Amendment that must include state action or (ii) the right to vote.

**A. This Court and Reconstruction-era courts have already rejected the argument that the support-or-advocacy clauses are limited to constitutional violations committed by state actors.**

This Court's opinion in *Paynes v. Lee* already established that the Act created a "Federal right . . . to recover damages for interfering with" certain rights, including against private individuals, and in addition to "deprivations of equal protection or equal privileges and immunities under the Fourteenth Amendment." 377 F.2d at 64. In *Paynes*, a black plaintiff sued three white men who threatened him to deter him from registering to vote. *Id.* at 63. The *Paynes* Court examined whether that was a proper claim under the support-or-advocacy clauses even though the complaint did not allege state action. *Id.* at 63-64. The Court held that the clauses were not limited to remedying Fourteenth and Fifteenth Amendment violations; instead, the support-or-advocacy clauses were "something more and something different" because Congress had created a "remedy for interference by private individuals." *Id.* at 63-64.

That reasoning applies equally to Cisneros's argument that the support-or-advocacy clauses merely provide a remedy for First Amendment rights. The First Amendment, after all, does not expressly apply to state actors, *see Barron v. City of Baltimore*, 32 U.S. 243, 250 (1833), instead, it was later incorporated against the

states by the Fourteenth Amendment, *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 808 (2019). In turn, *Paynes*'s holding that the support-or-advocacy clauses are not limited by the Fourteenth Amendment necessarily means that they are also not limited by the First Amendment. What is more, because the First Amendment restricts only *state action*, it is simply impossible to square Cisneros's position with this Court's ruling that support-or-advocacy clauses are a "remedy for interference *by private individuals*." *Paynes*, 377 F.2d at 63-64 (emphasis added).

Unsurprisingly then, multiple federal courts and legal commentators agree that the support-or-advocacy clauses "give[] rise to an independent substantive right." *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 486 n.30 (S.D.N.Y. 2020); *see also Andrews v. D'Souza*, 696 F. Supp. 3d 1332, 1346 (N.D. Ga. 2023) (following the "lengthy and reasoned analysis" in *National Coalition*); Michael Weingartner, *Remedying Intimidating Voter Disinformation Through § 1985(3)'s Support-or-Advocacy Clauses*, 110 Geo. L.J. Online 83, 102 (2021) ("The Fifth Circuit . . . has recognized that the support-or-advocacy clauses provide an independent substantive right"); Note, *The Support or Advocacy Clause of § 1985(3)*, 133 Harv. L. Rev. 1382, 1399-1400 (2020) (same). In other words, "the support and advocacy clause of Section 1985(3), . . . unlike the equal protection part of Section 1985(3)[,] does not require allegations of a . . . violation of a *separate* substantive right." *League of United Latin Am. Citizens - Richmond Region Council*

31

*4614 v. Pub. Int. Legal Found.* ("*LULAC*"), No. 1:18-CV-00423, 2018 WL 3848404, at *6 (E.D. Va. Aug. 13, 2018) (emphasis added) (citation modified).

Importantly, Reconstruction-era courts agreed. During Reconstruction, the United States brought criminal cases under Section 5520 of the Revised Statutes—the since-repealed criminal enforcement provision of the support-or-advocacy clauses. *See supra* at 23-24. Those cases, decided less than ten years after passage of the Act, did not adopt Cisneros's interpretation. In *United States v. Goldman*, for example, the court recognized that the support-or-advocacy clauses extended to political advocacy such that a conspiracy to "prevent an influential person of the opposite political party from giving his support and advocacy to a particular candidate, to arrest him and restrain him of his liberty until after the election," would be "forbidden" by the support-or-advocacy clauses. 25 F. Cas. 1350, 1352 (C.C.D. La. 1878) (No. 15,225). The court held that such a conspiracy would be actionable even if it would "be impossible to aver and prove what acts of support and advocacy by the person so restrained were contemplated." *Id.* The *Goldman* court also explained why protecting more than just the act of voting was a constitutional exercise of Congress's Article I powers to regulate federal elections, because the right to advocate for candidates in federal elections is part-and-parcel of the electoral process and far broader than just the act of voting:

> An election is not simply the depositing of a ballot in a box . . . . [A]n
> election implies a free interchange and comparison of views . . . . Any

interference with the right of the elector to make up his mind how he shall vote is as much an interference with his right to vote as if he were prevented from depositing his ballot in the ballot-box . . . .

*Id.* at 1353-54.

Likewise, in *United States v. Butler*, Chief Justice Waite's jury instructions distinguished between the charges based on the criminal enforcement provisions of the support-or-advocacy clauses (Section 5520 of the Revised Statutes) and Section 5508 of the Revised Statutes (Section 6 of the Enforcement Act of 1870). *See* 25 F. Cas. 213, 223-24 (C.C.D.S.C. 1877) (No. 14,700). Only when discussing Section 5508 charges did the Chief Justice clarify that the underlying right alleged to have been violated was the "right and privilege of voting." *Id.* at 223.

Cisneros makes no credible effort to explain how these cases can be squared with his interpretation of the Act. Nor could he. And as a result, the District Court's decision should be affirmed.

**B. The support-or-advocacy clauses' text and history confirm that they create an independent substantive right to engage in support or advocacy in federal elections.**

Even setting aside *Paynes* and the Reconstruction-era cases, the statutory text of the support-or-advocacy clauses is independently fatal to Cisneros's argument. In particular, Cisneros's contentions have two fundamental problems: they rely on cases interpreting the distinctly different text of *other* provisions of Section 1985, and they fail to engage with the actual text of the support-or-advocacy clauses.

As the Supreme Court recognized in *Kush* and as outlined in detail *supra* at 15-22, not all the provisions of Section 1985 are identical—they have different texts and constitutional groundings that must be considered when interpreting the statute. *E.g.*, 460 U.S. at 724-27. Thus, when interpreting Section 1985, it is "of greatest importance" that there must be some "statutory language that provides the textual basis" for any limiting construction. *Id.* at 726. Any "non-textual limiting construction" would be "erroneous[]." *Kinney*, 367 F.3d at 352 n.14.

Cisneros's brief points to no limiting language in the support-or-advocacy clauses. The closest he comes is to claim that Section 1985 supposedly "only protects the depravation (*sic*) of a right or privilege of [a] citizen of the United Sates (*sic*)." App. Br. 13 (citation modified). But that argument fails for two reasons. For one, that statutory language is not even from the support-or-advocacy clauses; it is instead from the end of Section 1985(3) and provides the cause of action for all the conspiracies prohibited by Section 1985. For another, Cisneros omitted a key portion—the full text of that provision creates a remedy both for those that are deprived of a right *and those that are injured* by an unlawful conspiracy prohibited by Section 1985:

> if one or more persons engaged therein do . . . any act in furtherance of the object of such conspiracy, *whereby another is injured* in his person or property, *or* deprived of having and exercising any right or privilege . . . *the party so injured* or deprived may have an action . . . .

42 U.S.C. § 1985(3) (emphasis added).

As a result, Cisneros's only textual argument actually supports Appellees' reading. The Act's use of the disjunctive "or" makes damages available for "injury" to "person or property" regardless of whether there was a violation of a "right or privilege of a citizen of the United States." And indeed, the Supreme Court has held that the phrase "injured in his person or property" in Section 1985 refers to "principles of tort law," thereby rejecting the view that injuries must be "constitutionally protected" before they are cognizable in a Section 1985 claim. *Haddle v. Garrison*, 525 U.S. 121, 127 (1998). Indeed, "[n]othing in the language . . . establishes such a requirement." *Id.* at 125. Thus, the text of Section 1985 permits victims of 1871 Act conspiracies that suffer tort-like injuries to bring claims regardless of whether they were deprived of a constitutional right, provided (of course) that the given conspiracy is not one of the provisions of the Act expressly limited to constitutional violations, such as the equal protection clauses. *See United Bhd. of Carpenters & Joiners of Am., Loc. 610, AFL-CIO v. Scott*, 463 U.S. 825, 833 (1983); *cf. Graham v. Connor*, 490 U.S. 386, 393-94 (1989).

Given these precedents, the District Court properly recognized that the key question is one of statutory interpretation. ROA.25485. More specifically, this Court must ask: when Congress used the words "support or advocacy" in the Act, did it mean to use the terms in their ordinary, common, everyday meaning (which would include political speeches by surrogates and supporters advocating for a federal

candidate's election)? Or did Congress mean to give the terms "support or advocacy" the specialized, remedial meanings of "the constitutional right to vote" and "the constitutional right to engage in First Amendment protected activities"?

Under the standard rules of statutory interpretation, the answer is clear: the clauses create a substantive right separate from the right to vote and the First Amendment.

Starting with ordinary meaning, the support-or-advocacy clauses' "plain language . . . prevents (among other things) conspiracies to prevent someone from advocating for a federal candidate for office *or* injuring someone for such advocacy." *Andrews*, 696 F. Supp. 3d at 1347 (emphasis in original). As the District Court recognized, "the use of the elaborate phrase 'giving his support or advocacy in a legal manner' instead of the simpler term 'voting' shows that Congress intended to extend protection to a broad range of election-related support or advocacy." ROA.25486.

Dictionary definitions from the time of the Act's passage only support that conclusion. Dr. Webster's 1864 Unabridged Dictionary defines advocacy to mean "[t]he act of pleading for or supporting; vindication; defense; intercession." New

Illustrated Edition of Dr. Webster's Unabridged Dictionary of the English Language 24 (London: Bell and Daldy 1864).[5] Dr. Webster defines "support" as:

> 6. To carry on; to enable to continue; to maintain; as to *support* government; to *support* a war or a contest; to *support* an argument or debate. . . .

> 9. To uphold by aid or countenance; as, to *support* a friend or a party; to support the administration.

> 10. To attend as a honorary assistant; as a chairman *supported* by a vice chairman . . . .

Id. at 1330.[6] In both instances, "Speeches by surrogates in favor of presidential candidates and related presidential campaign activities that provide political assistance, argument, and aid fall under these definitions." ROA.25487. There is simply no way to read the ordinary meaning of the support-or-advocacy clauses as somehow limited to interference with the constitutional right to vote or First Amendment violations. *Cf. Sirius Sols., L.L.L.P. v. Comm'r of Internal Revenue*, 165 F.4th 374, 378 (5th Cir. 2026) ("[W]e routinely consult dictionaries as a principal

---

[5] Cited excerpts *of New Illustrated Edition of Dr. Webster's Unabridged Dictionary of the English Language* (London: Bell and Daldy 1864) are included at ROA.18794-18799.

[6] *See also id.*, defining the noun form of "support" as "the act or operation of supporting, upholding, or sustaining."

source of ordinary meaning . . ." (quoting *Belt v. EmCare, Inc.*, 444 F.3d 403, 412 (5th Cir. 2006)) (alteration in original)).

The consistent usage canon also supports this reading. When reading statutes, courts routinely find that "a material variation in terms suggests a variation in meaning." *Landry's, Inc. v. Ins. Co. of the State of Pa.*, 4 F.4th 366, 370 (5th Cir. 2021) (quoting Antonin Scalia & Bryan Garner, *Reading Law* 170 (2012)). And here, when the Reconstruction Congress meant to reference the right to vote and the First Amendment, it did so directly. For example, another Reconstruction law protecting the right to vote used the term "vote" or "voting" at least six times.[7] Importantly, the support-or-advocacy clauses also use the word "vote" as a distinct term from "support or advocacy" (separated by just three words). *See* 42 U.S.C. § 1985(3). And it would be ludicrous to suggest that drafters of the Act did not know how to refer to constitutional rights when Section 1 of the Act protected against "deprivation[s] of any rights, privileges, or immunities secured by the Constitution." 17 Stat. 13 (now codified as 42 U.S.C. § 1983). Congress's choice to use different statutory language in the support-or-advocacy clauses should be respected. *See Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122, 132-33 (1989).

---

[7] See Act of May 31, 1870, ch. 114, §§ 3-4, 16 Stat. at 140-41, *ruled unconstitutional as a vehicle to enforce 15th Amendment in United States v. Reese*, 92 U.S. (2 Otto) 214 (1875).

The rule against redundancy also weighs against giving the support-or-advocacy clauses a remedial interpretation. ROA.25488. As the Supreme Court has explained, "it is almost impossible to believe that Congress intended, in the dissimilar language of the [Act to] simply . . . duplicate the coverage" of other portions of the Act. *Griffin*, 403 U.S. at 99. In turn, provisions of the Act should not be interpreted to "deprive" them "of all independent effect." *Id.* But Cisneros's interpretation would do just that, making the support-or-advocacy clauses redundant with the equal protection clauses by according both provisions *the exact same elements*.

Still more, the canon against imparting meaning to codification activities also rejects Cisneros's attempt to import case law (and arguments) interpreting Section 1985's *equal protection* clauses to interpret the *support-or-advocacy* clauses. As the District Court explained, it is an "established canon[] of statutory construction" that "it will not be inferred that Congress, in revising and consolidating the laws, intended to change their effect unless such intention is clearly expressed." ROA.25489 (quoting *Finley v. United States*, 490 U.S. 545, 554 (1989)). Thus, even though the remedial equal protection clauses immediately precede the support-or-advocacy clauses as codified in Section 1985(3), the proximity in the U.S. Code between the two provisions does not shed any light on the question of whether

support-or-advocacy clauses are also remedial.[8] The clauses were not codified together until three years after the Act passed, *see supra* at 23; *Kush*, 460 U.S. at 724 n.6, and that process was "not intended" to change the meaning of enacted statutory provisions, *id.* at 724. As with other statutory provisions from the same era, "[t]he combination and transposition of" the support-or-advocacy clauses and the equal protection clauses into "a single section of the Revised Statutes . . . cannot be held to have altered the scope and purpose of these enactments." *Logan v. United States*, 144 U.S. 263, 302 (1892), *abrogated on other grounds by Witherspoon v. Illinois*, 391 U.S. 510 (1968).

In addition to the canons above—all credited by the District Court—it is also a fundamental canon of statutory construction that a court should not adopt an "anachronistic interpretation of the text." *United States v. Bryant*, 996 F.3d 1243, 1262 (11th Cir. 2021), *superseded in part on other grounds by* U.S.S.G. § 1B1.13 (2023). Importantly, when Section 1985 was passed in 1871, First Amendment rights could only be asserted against the federal government, not against state governments. It was not until a half-century later that the Supreme Court held that the First Amendment applied to states. *E.g.*, *Stromberg v. California*, 283 U.S. 359, 368-69 (1931). The support-or-advocacy clauses therefore cannot have been enacted as a vehicle to enforce First Amendment rights. Otherwise they would have provided

---

[8] *See infra* at 42-44 (discussing *Bray* and *Carpenters*).

a remedy only against the federal government—an outcome that simply cannot be squared with the Act's aim to address private and state interference *with*, not *by*, federal government operations and mandates. *See supra* at 17-18; *McCord*, 636 F.2d at 615 (noting that the Act was passed in large part to protect the "operation of government, especially the federal government").

Relatedly, Cisneros's interpretation is contradicted by the Act's legislative history. ROA.25488-25489. More specifically, Cisneros's repeated attempts to invoke cases and interpretations of Section 1985's *equal protection clauses* cannot account for the fact that the provisions were added to the statute separately and relied on different constitutional groundings. As is laid out in detail *supra* at 18-20, the equal protection clauses came from the House and were designed to narrow an earlier proposal, which did not yet include the support-or-advocacy clauses, so that the equal protection clauses' prohibition of conspiracies violating rights, privileges, and immunities did not exceed Congress's Fourteenth Amendment power. CONG. GLOBE, 42d Cong., 1st Sess. 477-78; *see also McCord*, 636 F.2d at 615. By contrast, the support-or-advocacy clauses were introduced in the Senate and passed without controversy days later. *See supra* at 21-22; CONG. GLOBE, 42d Cong., 1st Sess. 704, 724. They raised none of the federalism concerns raised by the equal protection clauses. *See Kush*, 460 U.S. at 726 (constitutional concerns about equal protection

clauses in the Act do "not apply to the portions of the statute that prohibit interference with . . . federal elections").

The legislative history also rebuts any suggestion that Congress's concerns when passing the Act were limited to the narrow act of voting. ROA.25489-25490. For example, at the time the Act was passed, the politically motivated terror of the Klan included "breaking up Republican meetings" and "threatening political leaders." *McDonald v. City of Chicago*, 561 U.S. 742, 856 (2010) (Thomas, J., concurring). Overall, a careful review of the text and history of the support-or-advocacy clauses leaves no room for Cisneros's position.

### C. Cisneros's contrary cases are either distinguishable or unpersuasive.

Despite the clear textual and historical evidence that the clauses are substantive, Cisneros argues for the opposite conclusion by relying on distinguishable or wrongly reasoned cases.

First, Cisneros cites *Carpenters v. Scott* and *Bray v. Alexandria Women's Health Clinic* to argue that the support-or-advocacy clauses are merely remedial. App. Br. 14. Neither is a support-or-advocacy case. ROA.25490-25491. As both the majority opinion and the dissent in *Carpenters* made clear, *Carpenters* expressly does not interpret the support-or-advocacy clauses, but instead focuses on the equal protection clauses. *See* 463 U.S. at 827 (stating that "[t]his case concerns" the statutory language of the equal protection clauses); *id.* at 839 n.1 (Blackmun, J.,

dissenting) (observing that the "first clause" of "§ 1985(3)" was "at issue here," and not support-or-advocacy clauses). *Carpenters* had no reason to consider the support-or-advocacy clauses, as *Carpenters* dealt with a union attack on a construction site. *Id.* at 828. And *Bray* is an abortion clinic access case that has nothing to do with federal elections and plainly purports to interpret Section 1985's equal protection clauses. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 266-68 (1993).

The differing texts and constitutional groundings of the equal protection clauses and the support-or-advocacy clauses make *Carpenters* and *Bray* poor guides for interpreting the support-or-advocacy clauses. As explained *supra* at 39-40, it is legal error to look to codification location to aid in interpreting Reconstruction laws. In turn, the relevant unit of textual interpretation here is Section 2 of the original Act found in the *Statutes at Large* and not merely the two provisions of Section 2 now found in Section 1985(3).[9] And nothing in the text of Section 2 of the Act requires the support-or-advocacy clauses to be remedial: other provisions enacted in

---

[9] Moreover, even if a court could look to codification location when interpreting a statute—against the rules of statutory interpretation—that analysis would be ultimately inconclusive here because the codifiers were not consistent in their treatment of the support-or-advocacy and equal protection clauses. In particular, while the civil enforcement provisions of the equal protection and support-or-advocacy clauses were codified together in Section 1980 of the *Revised Statutes*, the criminal enforcement provisions were codified separately. The equal protection clauses' criminal enforcement provision was codified at Section 5519 and the support-or-advocacy clauses' criminal enforcement provision was codified at Section 5520. *See supra* at 23.

Section 2 of the Act were, in fact, substantive. For example, Section 1985(2)—initially part of the same laundry list of prohibited conspiracies as the support-or-advocacy clauses, *see supra* at 16—creates a substantive right to be free of intimidation when testifying in federal court.[10] This Court should not conclude that the support-or-advocacy clauses are remedial simply because another provision in the same section is remedial. Rather, whether a particular provision in Section 2 is substantive or remedial must be determined by reference to the text of the prohibition, and the text of the support-or-advocacy clauses only supports a substantive reading. *See supra* at 33-41.

In fact, unlike the support-or-advocacy clauses, Section 1985's equal protection clauses *must* be remedial because they are passed pursuant to remedial constitutional authority. *See City of Boerne v. Flores*, 521 U.S. 507, 519 (1997) (Congress's power to enforce the Fourteenth Amendment is "remedial"). By contrast, as the District Court held, ROA.25505-25510, and Cisneros did not contest on appeal (thereby waiving any challenge), the support-or-advocacy clauses are straightforward exercises of Congress's Article I powers under the Elections Clause and the Necessary-and-Proper Clause to regulate federal electoral activity. *See Kush*, 460 U.S. at 726 (constitutional concerns about equal protection clauses in the Act do

---

[10] Only criminal defendants have a constitutional right to be a witness in federal court. *See Rock v. Arkansas*, 483 U.S. 44, 49-53 (1987).

"not apply to the portions of the statute that prohibit interference with . . . federal elections"); *Crosby*, 25 F. Cas. at 704; Volokh, *supra*, 16 Tex. Rev. L. & Pol. at 323-24.

Those powers are not solely remedial. Article I empowers Congress to provide a "complete code for congressional elections," *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8-9 (2013), and that authority allows Congress to "erect[] . . . barriers to a potential threat to the federal electoral process," *United States v. Bowman*, 636 F.2d 1003, 1012 (5th Cir. Unit A Feb. 1981), including the authority to regulate private parties "before the voting stage . . . whenever it is reasonably related to protection of the integrity of the federal electoral process." *United States ex rel. Katzenbach v. Original Knights of Ku Klux Klan*, 250 F. Supp. 330, 352 (E.D. La. 1965) (citation modified). There is no question that Congress's Article I powers allow for statutes that protect the "free interchange and comparison of views" in federal elections. *Goldman*, 25 F. Cas. at 1354. As the District Court explained, such statutes are necessary and proper to ensure that intimidation "does not interfere with the fundamental fairness of an election by denying one locally disfavored candidate the same ability to campaign as another candidate." ROA.25509.[11] And, in turn, this

---

[11] Moreover, as the District Court also highlighted, there is nothing unusual about Congress's Article I powers being used to protect federal campaigns from improper interference and other corrupting influences, protections which are not limited to the act of ballot-casting. *See, e.g.*, *McConnell v. FEC*, 540 U.S. 93, 187 (2003), *overruled on other grounds by Citizens United v. FEC*, 558 U.S. 310 (2010); *Buckley*

Court need not look past the ordinary meaning of the words "support or advocacy" for fear of exceeding Congress's constitutional powers.

With the exception of two Eighth Circuit cases discussed *infra* at 47-48, and *Graham v. Clusen*, 427 F. Supp. 820 (D.D.C. 1977), the remainder of the cases Cisneros cites are not support-or-advocacy cases at all. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 938-39, 942 (1982) (state action required for plaintiff's 42 U.S.C. § 1983 claim); *Gerber v. Herskovitz*, 14 F.4th 500, 511 (6th Cir. 2021) (state action required for equal protection clauses claim); *Brooks v. Nacrelli*, 473 F.2d 955, 957-58 (3d Cir. 1973) (addressing only the Act's equal protection clauses claims and Fourteenth Amendment equal protection claims on appeal); *Grimes v. Smith*, 776 F.2d 1359, 1363 (7th Cir. 1985) (equal protection clauses claim); *Gray v. Darien*, 927 F.2d 69, 73 (2d Cir. 1991), *cert. denied*, 502 U.S. 856 (1991) (same); *Cook v. Randolph Cnty.*, 573 F.3d 1143, 1149 (11th Cir. 2009) (same). And with respect to *Graham*, that court did not *limit* the support or advocacy clauses to the act of voting, as the District Court explained in a lengthy footnote. ROA.25493. Rather, the *Graham* court "assume[d] that an informed vote was *an interest* that Congress sought to protect in" Section 1985(3). *Graham*, 427 F. Supp. at 821 (emphasis added).

---

*v. Valeo*, 424 U.S. 1, 13 (1976); *Burroughs v. United States*, 290 U.S. 534, 545-47 (1934). Were it otherwise, it "would . . . invite the invalidation of all federal campaign finance law." ROA.25508.

That leaves Cisneros's invitation to follow *Gill v. Farm Bureau Life Insurance Co. of Missouri*, 906 F.2d 1265, 1270-71 (8th Cir. 1990), and *Federer v. Gephardt*, 363 F.3d 754, 760 (8th Cir. 2004). This Court should decline for the same reason the District Court did, ROA.25492: although *Gill* and *Federer* do interpret the support-or-advocacy clauses, they are not persuasive because—as Professor Volokh has highlighted—they are based on a fundamental "misreading of § 1985" and lack a grounding in the statutory text. Volokh, *supra*, 16 Tex. Rev. L. & Pol. at 324 & n.18; Craig R. Senn, *Ending Political Discrimination in the Workplace*, 87 Mo. L. Rev. 365, 396-97 (2022) (explaining that "[l]egal scholars have . . . persuasively argu[ed] that" the Eighth Circuit's approach "mistakenly conflates Section 1985(3)'s equal protection and support or advocacy clauses") (citation modified). In particular, *Gill* engages in no textual analysis to justify why cases interpreting Section 1985's equal protection clauses shed any meaning on the text of the support-or-advocacy clauses. Instead, the *Gill* court cursorily reasoned that the plaintiff's allegations were fatally flawed because the "essence" of the plaintiff's claim was "the assertion of a First Amendment type right," and the First Amendment was not applicable because *Carpenters* held that a First Amendment claim required state action. *Gill*, 906 F.2d at 1270-71. Other than a footnote asserting the position's "inherent correctness," *id.* at 1270 n.25, *Gill* does not explain (nor could it) why the drafters of the support-or-advocacy clauses would have wanted to limit the clauses to remediation of First

47

Amendment rights when the First Amendment only applied to the federal government at that time. In short, this Court should decline to follow *Gill* because the relevant statutory language is "not limited to violations of the First Amendment." Volokh, *supra*, 16 Tex. Rev. L. & Pol. at 324.[12]

*Federer* fares no better. As a subsequent Eighth Circuit case, *Federer* had to follow *Gill* and offered no independent analysis. *See* 363 F.3d at 760. This Court should therefore find it no more persuasive than *Gill*, and instead adopt the substantive reading of the support-or-advocacy clauses required by the plain text of the provision and its prior case law.

> **D.** **Because the support-or-advocacy clauses create a substantive right to engage in support-or-advocacy in federal elections, they neither require state action nor are limited to only private conspiracies connected to voting.**

As explained above, the support-or-advocacy clauses employ specific language to establish a substantive right that is protected directly by federal statute, independent of any violations of constitutional rights. That conclusion is fatal to both Cisneros's claims that the support-or-advocacy clauses (1) require state action, App.

---

[12] Elsewhere in *Gill*, the Eighth Circuit suggested that certain injuries are not cognizable under the Act if not closely related to the Klan's Reconstruction-era activities. As Professor Volokh also points out, that suggestion is "no longer good law after *Haddle*." Volokh, *supra*, 16 Tex. Rev. L. & Pol. at 321 n.121.

Br. 13-16, and (2) do not create an action for protection of federal election advocacy enforceable against private parties, App. Br. 16-17.

As the District Court recognized, both contentions ultimately turn on the question of whether the support-or-advocacy clauses are substantive or remedial. ROA.25495-25496. If, for example, the clauses are remedial and only allow for the invocations of rights found elsewhere, then the clauses would be defined by the breadth of those rights—including the limitations Cisneros points to on First Amendment and right-to-vote claims. But, as the District Court properly concluded, if the support-or-advocacy clauses are substantive, then that argument disappears because the clauses would be "a substantive provision that provides direct protection for support or advocacy related to federal election," ROA.25495-25496.

This Court should reject Cisneros's argument, as the District Court properly did. As a matter of statutory text, the support-or-advocacy clauses are "distinct from" Section 1985(3)'s equal protection clauses because the support-or-advocacy clauses "delineate[] the right to be protected directly" and "do[] not refer to another source of law." *Id.* Thus, Cisneros lacks a textual hook for his argument as there is no "language . . . restrict[ing] the" support-or-advocacy clauses "to conspiracies to violate the First Amendment or that involve state action" unlike "neighboring provisions." ROA.25496. And, by extension, this Court should affirm the District Court's interpretation of the support-or-advocacy clauses and conclude that the

clauses create substantive federal rights that "appl[y] to private conspiracies, no matter if the basis of the claim is alleged interference with the act of voting or election advocacy." ROA.25497.

## II. The District Court correctly held that the support-or-advocacy clauses do not require a showing of class-based animus.

Finally, Cisneros argues that the support-or-advocacy clauses require a showing of class-based animus. App. Br. 17-20. But the support-or-advocacy clauses simply lack the statutory text that gives rise to the class-based animus requirement. ROA.25497-25501. And Cisneros's best Fifth Circuit case on the point—*Kimble v. D. J. McDuffy, Inc.*, 648 F.2d 340 (5th Cir. 1981) (en banc)—was later abrogated in relevant part by the Supreme Court in *Kush*. Thus, plaintiffs bringing a claim under the support-or-advocacy clauses need not show class-based animus.

The Supreme Court has explained that the "source of the animus requirement" for certain Section 1985 claims "is the language" found in some—*but not all*—provisions "requiring intent to deprive of *equal* protection." *Bray*, 506 U.S. at 281 & n.13 (citation modified). Given that, the Court set out a simple test for determining when class-based animus must be alleged in a Section 1985 claim: does the provision at issue contain the "critical language" requiring conspirators to be motivated by a desire to deny equal protection? *Kush*, 460 U.S. at 720. If not, then a plaintiff need not allege animus, as courts must not add elements that "do[] not appear in the portion of the statute that applies to [a particular] case." *Id.* at 726.

50

Under that test, courts do not impose an animus requirement where the text "does not demand a denial of 'equal protection of the laws.'" *McCord*, 636 F.2d at 614 & n.12. Thus, plaintiffs bringing claims under the second clause of Section 1985(2) (the administration of state justice clauses) and the equal protection clauses of Section 1985(3) must allege class-based animus because those provisions *do* contain language requiring "an intent to deprive . . . victims of the equal protection of the laws." *Kush*, 460 U.S. at 725.

But plaintiffs bringing claims under Section 1985(1), the first clause of Section 1985(2), and the support-or-advocacy clauses of Section 1985(3) at issue here, do not need to allege class-based animus because those provisions "contain no language requiring that the conspirators act with intent to deprive their victims of the equal protection of the laws." *Id.* at 724-25. And that makes sense. As *Kush* explains, and as described *supra* at 18-20, the equal protection language was added to certain 1871 Act provisions to avoid constitutional questions about displacement of state law. *Id.* at 726; Volokh, *supra*, 16 Tex. Rev. L. & Pol. at 323. That constitutional concern, however, "does not apply to the portions of the statute that prohibit interference with federal officers, federal courts, or federal elections," *Kush*, 460 U.S. at 726, and therefore the limiting language does not appear in the support-or-advocacy clauses. *See supra* at 18-20 (explaining origin of animus requirement).

This Court has followed the *Kush* approach as well, though it has not yet had occasion to apply this test to the support-or-advocacy clauses. For example, in *Bryant v. Military Department of Mississippi*, a former member of the Mississippi Air National Guard brought claims under Section 1985(1) and the second clause of Section 1985(2) against Guard officials. 597 F.3d 678, 683, 687 (5th Cir. 2010). This Court affirmed the dismissal of the plaintiff's Section 1985(2) claim because the plaintiff failed to allege class-based discriminatory animus. *Id.* at 687. However, the Court relied upon *Kush* to hold that "[a] cause of action under § 1985(1) requires no allegation of racial or class-based discriminatory animus." *Id.* at 688. Likewise, in *Daigle v. Gulf State Utilities Co.*, this Court required a showing of class-based animus only for the 1871 Act claims that had the key "equal protection language." 794 F.2d 974, 979-80 (5th Cir. 1986); *see also id.* at 979 n.5 ("[T]he equal protection language . . . requires race or class-based animus."); *id.* at 978 n.2 (noting that the "pertinent part" of Section 1985(3) at issue in *Daigle* was the equal protection clauses).

Under that logic, the support-or-advocacy clauses also do not require an allegation of racial or class-based discriminatory animus. *See* Volokh, *supra*, 16 Tex. Rev. L. & Pol. at 323-24 (explaining that *Kush*'s "reasoning applies as much to" support-or-advocacy claims "which involve retaliation for supporting a federal candidate, as it does to" the section of 1985 at issue in *Kush*). Critically, the support-

or-advocacy clauses do not have the statutory language giving rise to the class-based animus requirement, and "non-textual limiting construction[s]" of Section 1985 are "erroneous[]." *Kinney*, 367 F.3d at 352 n.14. Multiple district courts have also come to the same conclusion. *See Nat'l Coal.*, 498 F. Supp. 3d at 487 ("[P]laintiffs suing under the Support or Advocacy Clause need not demonstrate that defendants acted with discriminatory, class-based animus."); *Andrews*, 696 F. Supp. 3d at 1346 (same); *LULAC*, 2018 WL 3848404, at *6 (same).

Cisneros's main case to the contrary—*Kimble*, 648 F.2d 340, App. Br. 18—predates *Bryant* and *Daigle* and does not survive *Kush. See Kush*, 460 U.S. at 723 (noting *Kimble*'s "narrow[er]" view of Section 1985(2)). *Kimble* expressly declined to adopt a "hypertechnical analysis of the structure and grammar" of Section 1985 and held that animus was required for any Section 1985 claim. 648 F.2d at 347. *Kush*, decided two years later in 1983, rejected that approach, as this Court recognized en banc in *Kinney*, 367 F.3d at 352 n.14 ("*Kush* is notable because it rejected a non-textual limiting construction that certain circuits, including this one, had erroneously embraced.").

Cisneros's other main case, *McLellan v. Mississippi Power & Light Co.*, does no better. It predates *Kush* and is a bankruptcy dispute brought under the Section 1985 equal protection clauses, *see* 545 F.2d 919, 922 (5th Cir. 1977) (en banc), which have the key equal protection language that the support-or-advocacy

clauses lack.[13] As explained *supra* at 39-40, the proximity of the clauses is irrelevant to this issue; *Kush* instructs that codification location should not be used as an aid when interpreting the act. *See* 460 U.S. at 724-26 & n.6.

Accordingly, this Court should follow *Kush* and affirm the District Court because the support-or-advocacy clauses lack the statutory text that gives rise to the class-based animus requirement.

## CONCLUSION

The District Court's denial of Cisneros's Rule 50 motion should be AFFIRMED.

---

[13] The other cases that Cisneros cites are not support-or-advocacy cases. App. Br. 18-19. *Carpenters* and *Bray* were brought under the equal protection clauses. *Supra* at 42-43. The same is true for: *Horaist v. Doctor's Hosp. of Opelousas*, 255 F.3d 261, 270-71 & 270 n.12 (5th Cir. 2001); *Bryan v. City of Madison*, 213 F.3d 267, 276 (5th Cir. 2000); *Newberry v. E. Texas State Univ.*, 161 F.3d 276, 280-81 (5th Cir. 1998); *Deubert v. Gulf Fed. Sav. Bank*, 820 F.2d 754, 757 (5th Cir. 1987); *Prescott v. Denton Cnty. Jail*, No. 4:16-CV-879, 2025 WL 891871, at *23-24 (E.D. Tex. Feb. 25, 2025), *report and recommendation adopted*, No. 4:16-CV-879, 2025 WL 885850 (E.D. Tex. Mar. 21, 2025); *Andrade v. Stewart*, No. CV 20-886-BAJ-SDJ, 2022 WL 1286230, at *4 (M.D. La. Jan. 5, 2022), *report and recommendation adopted*, No. CV 20-00886-BAJ-SDJ, 2022 WL 731514 (M.D. La. Mar. 10, 2022); and *Cunningham v. Panola Cnty.*, No. 6:10-CV-362, 2011 WL 2149537, at *11 (E.D. Tex. May 8, 2011), *report and recommendation adopted*, No. 6:10CV362, 2011 WL 2135439 (E.D. Tex. May 31, 2011).

Dated: April 22, 2026

Respectfully submitted,

*/s/ Samuel Hall*

Samuel Hall
Robert Meyer
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 303-1000

Aaron E. Nathan
WILLKIE FARR & GALLAGHER LLP
787 Seventh Ave.
New York, NY 10019
Telephone: (212) 728-8904

JoAnna Barbara Suriani
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, # 163
Washington, D.C. 20006
Telephone: (202) 579-4582

Benjamin L. Berwick
PROTECT DEMOCRACY PROJECT
15 Main Street, Suite 312
Watertown, MA 02472
Telephone: (202) 579-4582

Sarah Xiyi Chen
Zachary Dolling
TEXAS CIVIL RIGHTS PROJECT
P.O. Box 17757
Austin, TX 78760
Telephone: (512) 474-5073

Nina Lea Oishi
TEXAS CIVIL RIGHTS PROJECT
P.O. Box 1108

Houston, TX 77251
Telephone: (512) 474-5073

***Counsel for Plaintiffs-Appellees
Wendy Davis, David Gins, and
Timothy Holloway***

**CERTIFICATE OF SERVICE**

I hereby certify that on April 22, 2026, a true and correct copy of the foregoing

was served via electronic filing with the Clerk of Court and all registered ECF users.


*/s/ Samuel Hall*
Samuel Hall

*Attorney for the Plaintiffs-Appellees*

**CERTIFICATE OF COMPLIANCE**

This brief has been prepared using 14-point, proportionately spaced, serif typeface, in Microsoft Word. Excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fifth Circuit Rule 32.2, this brief contains 12,810 words.

Dated:  April 22, 2026                          */s/ Samuel Hall*
                                                        Samuel Hall

                                                        *Attorney for the Plaintiffs-Appellees*